Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>SANTOS COLLADO RODRÍGUEZ<br><br>Apelante | KLAN202400844 | APELACIÓN<br>Procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Crim. Núm.:<br>J EC2024G0004<br><br>Por: Art. 127A del CP |

Panel integrado por su presidenta, la Juez Brignoni Mártir, la Jueza Álvarez Esnard y la Jueza Prats Palerm.

Álvarez Esnard, jueza ponente

## SENTENCIA

En San Juan, Puerto Rico, a 17 de julio de 2025

Comparece ante nos el señor Santos Collado Rodríguez ("señor Collado Rodríguez" o "Apelante") mediante *Apelación Criminal* presentada el 11 de septiembre de 2024. En esta, nos solicita que revoquemos la *Sentencia* emitida y notificada el 26 de agosto de 2024 por el Tribunal de Primera Instancia, Sala Superior de Ponce ("foro primario" o "foro *a quo*"). Por virtud del aludido dictamen, el foro primario condenó al Apelante a cumplir una pena de seis (6) años en prisión tras habérsele encontrado culpable por infracción al Artículo 127 B del Código Penal de Puerto Rico, Ley Núm. 146-2012, según emendada, 33 LPRA sec. 5186b ("Código Penal").

Por los fundamentos que discutiremos a continuación, **confirmamos** la *Sentencia* recurrida.

### I.

Por hechos ocurridos el 1 de enero de 2024, el Ministerio Público presentó *Denuncia* contra el señor Collado Rodríguez por

Número Identificador

SEN(RES)2025_____

violación al Artículo 127 A del Código Penal, *supra*.[1] Conforme se desprende de la aludida denuncia, el Apelante, amenazó a su madre, la señora Gladys Rodriguez Ramos, de setenta y ocho (78) años, con causarle daño al manifestarle en varias ocasiones que la iba a matar.

Así las cosas, el 2 de enero de 2024, se determinó causa para arresto contra el Apelante.[2] Posteriormente, el 31 de enero de 2024, el señor Collado Rodríguez sometió documento intitulado *Renuncia del (de la) Acusado(a) a Vista Preliminar*.[3] Tras evaluar el aludido documento, en igual fecha, el foro primario emitió *Resolución Vista Preliminar Regla 23 de Procedimiento Criminal*,[4] en la cual, detalló que tuvo ante su consideración la renuncia a vista preliminar del Apelante. En la misma, el foro *a quo* detalló que el Apelante fue apercibido de las consecuencias de renunciar a dicha vista y determinó que la misma fue realizada libre, voluntaria e inteligente. Cónsono con lo antes expresado, se encontró causa probable por el Artículo 127 del Código Penal, *supra*. Como corolario de ello, el 2 de febrero de 2024, el Ministerio Público emitió *Acusación* contra el Apelante por el delito contenido en el Artículo 127-A del Código Penal, *supra*.[5] La aludida acusación dispone lo siguiente:

> El referido acusado, Santos Collado Rodríguez, para el día 11 de enero de 2024, a eso de las 6:30 pm y en Yauco, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala Superior de Ponce, ilegal y a sabiendas y criminalmente incurrió en un acto que puso en riesgo la salud e integridad física, mental y emocional de su señora madre, Gladys Rodríguez Ramos, de 78 años de edad consistente en que la amenazó con causarle algún daño manifestándole en varias ocasiones que la iba a matar, que va a matar a todos, sintiendo la perjudicada temor por su seguridad.[6]

Tras varios trámites procesales, el 8 de julio de 2024, se llevó a cabo el juicio en su fondo. Cabe destacar que, en el aludido juicio, el Ministerio Público presentó los siguientes testimonios:

---

[1] Véase, Autos Originales del Caso J EC2024G0004, págs. 1-2.
[2] *Íd.*, pág. 3.
[3] *Íd.*, pág. 29.
[4] *Íd.*, págs. 40-41.
[5] *Íd.*, pág. 43.
[6] *Íd.*

1. Agente Wendy I. Almodóvar
2. Gladys Rodríguez
3. Ingrid Gladys Collado Rodríguez

Sometido el caso, las partes expusieron sus respectivas argumentaciones finales frente al juez que presidía los procedimientos. Acto seguido, el foro primario determinó, en cuanto al caso J E2024G0004, la culpabilidad del Apelante por infracción al Artículo 127 B del Código Penal. Como corolario de lo anterior, el 26 de agosto de 2024, el foro *a quo* emitió *Sentencia* y por virtud de esta dispuso lo siguiente:

> Hoy, **26 de agosto de 2024** llamado el caso de epígrafe, comparecieron en corte abierta **EL PUEBLO DE PUERTO RICO**, representado por el **Fiscal Wilfredo Santiago** y el confinado de la (Ponce 676) de epigrafe Santos Collado Rodríguez en persona y asistido por el abogado, el **Lcdo. Abimael J. López Quintero**. Habiéndose dado a la acusación y preguntando por el Tribunal que alegación de culpabilidad hacía, el acusado manifestó que se declaraba **No Culpable** del delito **Art. 127 (A**) del código penal, celebrado el Juicio el día, 8 de julio de 2024, el Tribunal lo declara **Culpable**, por el artículo **127** del código penal, luego de escuchar determinar que la misma se hizo voluntariamente con conocimiento de la naturaleza del delito imputado y de las consecuencias de dicha alegación.
>
> El Tribunal luego de escuchar al convicto y a su representación legal a los efectos de que quiere ser sentenciado a pena de cárcel, lo condena a la pena de **SEIS (6) AÑOS DE CARCEL. SE EXIME DEL ARANCEL DE VICTIMAS Y TESTIGOS POR SER CLIENTE DE LA SOCIEDAD PARA LA ASISTENCIA LEGAL. SE ORDENA ABONAR TIEMPO CUMPLIDO EN PREVENTIVA,** [sic] [7]

Inconforme con el resultado, el 11 de septiembre de 2024, el Apelante compareció ante esta Curia mediante el recurso de epígrafe y formuló el siguiente señalamiento de error:

> Erró el Honorable Tribunal de Primera Instancia al encontrar culpable al señor Santos Collado Rodríguez en virtud de una prueba que no derrotó su presunción de inocencia y no estableció su culpabilidad más allá de duda razonable.

El 16 de septiembre de 2024, esta Curia emitió *Resolución* en la cual, entre otros asuntos, se le concedió al foro primario un término para que remitiera a la secretaría de este Tribunal de Apelaciones, la regrabación de los procedimientos, para así, ordenar

---

[7] *Íd.*, pág. 148.

la correspondiente transcripción. Asimismo, se dispuso que, una vez la transcripción estuviera completada, la misma sería notificada tanto a la Oficina del Procurador General de Puerto Rico como al Apelante. Igualmente, se le concedió al Apelante un *término* de treinta (30) días contados a partir del momento en que esta Curia acogiera la transcripción de la prueba oral para someter su alegato. De igual forma, dispusimos que la parte apelada en este caso, el Pueblo de Puerto Rico ("Apelado" o "el Estado") debería presentar su alegato en un término de treinta (30) días, a partir de la fecha de presentación del alegato instado por el Apelante.

Así las cosas, tras varios asuntos procesales, el 7 de marzo de 2025, dimos por estipulada la transcripción. A su vez, el 4 de abril de 2025, el señor Collado Rodríguez presentó *Alegato del Apelante*. Por virtud de este escrito, resumió los testimonios vertidos en el juicio y expuso su teoría legal del caso. Por su parte, el 5 de mayo de 2025, el Apelado sometió *Alegato de el* [sic] *Pueblo*. Mediante este escrito, el Estado, de igual manera, resumió la prueba testifical presentada en el juicio y esbozó que el error formulado por el Apelante no se cometió. Con el beneficio de la comparecencia de ambas partes, la evaluación de los documentos que obran en el expediente del recurso presentado ante nos, de los autos originales y de la transcripción de la prueba oral estipulada, procedemos resolver el asunto que está ante nuestra consideración.

## II.
### A. *Apelación Criminal*

En nuestra jurisdicción, "existe el derecho de todo acusado a apelar cualquier sentencia penal que recaiga en su contra". *Pueblo v. Rivera Ortiz*, 209 DPR 402, 419 (2022). Por ello, la determinación de culpabilidad del acusado más allá de duda razonable "es revisable en apelación, pues la apreciación de la prueba desfilada en un juicio es un asunto combinado de hecho y derecho*". Pueblo v.*

*Torres Medina*, 211 DPR 950, 959 (2023). Esto, pues, "[e]l análisis de la prueba presentada requiere tanto de la experiencia del juzgador como de su conocimiento del Derecho, elementos éstos necesarios para darle a la controversia una solución justa". *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002).

Por otro lado, la presunción de inocencia es uno de los derechos fundamentales que le asiste a todo acusado de delito. Este derecho está consagrado en el Artículo II, Sección 11, de nuestra Constitución, 1 LPRA Art. II, Sec. 11, y establece que toda persona es inocente hasta que se pruebe lo contrario.

A su vez, el aludido imperativo constitucional se incorporó estatutariamente en la Regla 304 de Evidencia donde establece la presunción de que toda persona es inocente de delito o falta hasta que se demuestre lo contrario. 32 LPRA Ap. VI, R. 304. De igual modo, la Regla 110 de Procedimiento Criminal, dispone que "[e]n todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá". 34 LPRA Ap. II, R. 110.

Conforme con el principio del debido proceso de ley, una persona acusada de delito se presume inocente hasta que, en juicio público, justo e imparcial, el Ministerio Fiscal pruebe más allá de duda razonable cada elemento constitutivo del delito y la conexión de estos con el acusado. *Pueblo v. Resto Laureano*, 206 DPR 963, 967 (2021); *Pueblo v. Rosaly Soto,* 128 DPR 729, 739 (1991). La prueba del Ministerio Público tiene que ser satisfactoria, de manera que produzca la certeza o la convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Acevedo Estrada*, 150 DPR 84, 100 (2000). Si la prueba desfilada por el Estado produce insatisfacción en el ánimo del juzgador, estamos ante duda razonable y fundada. *Pueblo v. Cabán Torres*, 117 DPR 645, 652 (1986).

La duda razonable, según ha aclarado el Tribunal Supremo de Puerto Rico, "existe cuando el juzgador de los hechos siente en su conciencia insatisfacción o intranquilidad con la prueba de cargo presentada". *Pueblo v. García Colon I*, 182 DPR 129, 175 (2011). Ello no significa que toda duda posible, especulativa o imaginaria tenga que ser destruida a los fines de establecer la culpabilidad del acusado con certeza matemática. *Pueblo v. Resto Laureano*, 206 DPR 963, 967 (2021) (Sentencia). Solo se exige que la prueba establezca aquella certeza moral que convence, dirige la inteligencia y satisface la razón. *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 65 (1991). Ahora bien, en los casos donde la prueba no establezca la culpabilidad más allá de duda razonable, no puede prevalecer una sentencia condenatoria. Véase, *Pueblo v. Irizarry, supra*, pág. 789.

De otra parte, "los tribunales apelativos pueden considerar cualquier error de derecho cometido por el Tribunal de Primera Instancia". *Pueblo v. Rivera Ortiz, supra*, pág. 422. Ello incluye errores de derecho que comete el foro primario durante el procedimiento judicial. *Íd.* Esto es así, pues la función de aplicar correctamente el derecho es privativa del juez y es por esa facultad que el tribunal está en libertad de aplicar la norma que estime pertinente y adecuada. *Íd.*

Así pues, "el alcance de nuestra función revisora está limitado por consideraciones de extrema valía". *Pueblo v. Toro Martínez*, 200 DPR 834, 857 (2018). Cónsono con lo anterior, nuestro esquema probatorio se encuentra revestido por un manto de deferencia hacia la adjudicación de credibilidad que realizan los foros de instancias sobre los testigos que declaran ante sí, como a las determinaciones de hechos realizadas por el juzgador. *Pueblo v. Negrón Ramírez*, 213 DPR 895, 911 (2024).

Por otro lado, es norma reiterada que, de ordinario, no se favorece la intervención de tribunales apelativos para revisar la

apreciación de la prueba referente a la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Pueblo v. Hernández Doble*, 210 DPR 850, 864 (2022). A tenor con lo antes mencionado, el Tribunal Supremo de Puerto Rico ha definido el concepto pasión perjuicio y parcialidad como "aquellas inclinaciones personales de tal intensidad que llevan a un juzgador a actuar movido por éstas y a adoptar posiciones, preferencias o rechazos con respecto a las partes o sus causas, sin admitir cuestionamientos sobre las mismas y sin importar la prueba que se haya presentado en el juicio". *Pueblo v. Negrón Ramírez, supra,* pág. 912 citando a *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co.,* 209 DPR 759, 779 (2022).

En cuanto al concepto *error manifiesto,* nuestra más Alta Curia ha determinado que el juzgador de los hechos incurre en dicho error si "aun habiendo alguna prueba que sostenga las determinaciones de hechos del tribunal, el foro revisor razona que se cometió un error, "como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida" (Énfasis suprimido). *Íd.,* págs. 912-913 citando a *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 772 (2013).

Ahora bien, un tribunal apelativo podrá revocar una determinación de culpabilidad realizada por el foro primario si "la prueba no concuerda con la realidad fáctica, es increíble o es imposible" (citas omitidas). *Íd.,* pág. 913. Asimismo, un foro apelativo también podrá intervenir con las determinaciones de hechos y apreciación de la prueba realizadas por el juzgador de los hechos "si se demuestra que éste incurrió en un abuso de discreción al apreciar y adjudicar la prueba presentada ante sí" (citas omitidas). *Íd.* A tono con lo anterior, nuestro Máximo Foro ha

destacado que la norma de deferencia apelativa aplica con el mismo rigor cuando lo que se tiene ante la consideración del foro apelativo es un veredicto de culpabilidad emitido por un jurado. *Íd.*, pág. 914.

### B. *Maltrato a personas de edad avanzada.*

El 12 de agosto de 2014, se aprobó la Ley 138-2014 con el fin de instaurar "el deber del Estado de promulgar y adoptar las medidas necesarias para detener y erradicar el maltrato, así como la negligencia hacia las personas de edad avanzada", Véase, *Exposición de Motivos* de la Ley 138-2014. La aludida legislación, entre otros asuntos, enmendó varias disposiciones de la Carta de Derechos de las Personas de Edad Avanzada e incorporó ciertos artículos al Código Penal de Puerto Rico. En concreto, se añadió a esta última legislación, el Artículo 127-A, el cual dispone:

> **Artículo 127-A. — Maltrato a personas de edad avanzada**
>
> Toda persona que, cometa abuso físico, emocional, financiero, agresión, robo, apropiación ilegal, amenaza, fraude, o violación, contra una persona de edad avanzada, causándole daño o exponiéndole al riesgo de sufrir daño a su salud, su bienestar, o sus bienes, será sancionada con pena de reclusión por un término fijo de diez (10) años. 33 LPRA sec. 5186a.

Asimismo, se incorporó en el Código Penal de Puerto Rico, el Artículo 127-B, el cual establece:

> Toda persona que amenazare a una persona de edad avanzada con causarle daño determinado a su persona, a otra persona o a los bienes apreciados por ésta será sancionada con pena de reclusión por un término fijo de seis (6) años. 33 LPRA sec. 5186b.

De otro lado, en cuanto a la definición del concepto amenaza, la profesora Dora Nevárez-Muñiz ha explicado que "[l]a amenaza es la expresión de que se llevará a cabo determinada intención delictiva o daño contra otra persona, sus derechos o bienes jurídicos". D. Nevares Muñiz, *Código Penal de Puerto Rico Comentado*, 4ta ed. rev., San Juan, Instituto para el Desarrollo del Derecho, 2019, pág. 281. En cuanto los elementos constitutivos de esta acción, la profesora Nevares-Muñiz detalla que son:

una manifestación expresa de voluntad, que puede ser verbal o escrita, de causar un daño determinado; dirigida a alguna persona, y una apariencia de peligro e intranquilidad para el destinatario de la o quien la escucha. El delito queda consumado cuando se hace la amenaza. *Íd.*

## III.

En el presente recurso, el Apelante nos solicita que revoquemos la *Sentencia* dictada y notificada el 26 de agosto de 2024 por el foro primario. Por virtud del aludido dictamen, el foro *a quo* sentenció al señor Collado Rodríguez a cumplir una condena de seis (6) años de reclusión por violar el Artículo 127- B del Código Penal, *supra*. Es menester aclarar que, si bien la acusación que pesa contra el señor Collado Rodríguez es por una infracción al Artículo 127-A del Código Penal, *supra*, conforme surge tanto de la *Minuta* del juicio celebrado el 8 de julio de 2024, como de la propia regrabación de los procedimientos, el foro primario encontró culpable al Apelante por infracción al Artículo 127-B del Código Penal.[8] Por ello, atenderemos el presente recurso, tomando en consideración el delito por el cual el Apelante fue encontrado culpable.

En su escrito, el Apelante alega, como único señalamiento de error que el foro primario erró al encontrarlo culpable toda vez que la prueba desfilada en el juicio no derrotó la presunción de inocencia ni estableció su culpabilidad más allá de duda razonable. Para atender este error de forma rigurosa y cumplir cabalmente con nuestra función revisora, procedemos a exponer de manera sucinta la prueba testifical que desfilada en el juicio.

En el juicio efectuado el 8 de julio de 2024, declararon en corte abierta, tres (3) testigos por parte del Ministerio Público. La primera testigo en declarar fue la **agente Wendy Almodóvar Vega** ("agente Almodóvar" o "agente"), quien atestó que, el 1 de enero de 2024, una compañera se había comunicado con una querellante identificada

---

[8] Véase, regrabación de la vista llevada a cabo el 8 de julio de 2024, min. 1:19:50-1:20:05.

como Ingrid, quien informó que su hermano estaba maltratando a su madre.[9] La agente Almodóvar expresó que, acto seguido, se personó al lugar del incidente y se encontró con la persona identificada como Ingrid.[10] Narró que, posteriormente, salió una persona identificada como Gladys.[11] La agente puntualizó que Gladys le manifestó que, esta última se encontraba en el exterior de su residencia cuando llegó su hijo, el señor Collado Rodríguez, **quien fue identificado en sala por la agente Almodóvar**.[12] Especificó que, las querellantes, a saber Gladys e Ingrid, le comentaron que el Apelante había explotado las gomas de un vehículo de motor perteneciente a Ingrid.[13] Además, la agente señaló que las querellantes informaron que el Apelante le profirió palabras soeces a su madre Gladys.[14]

De otro lado, la agente Almodóvar expuso que, luego de entrevistar a las querellantes, se dirigió en compañía del Sargento Ramón López Muñez, a la residencia del señor Collado Rodríguez y lo arrestó por maltrato a envejecientes.[15] Explicó que, tras el arresto, transportaron al Apelante a un hospital y, posteriormente, lo trasladaron al cuartel e ingresaron a una celda.[16] La agente Almodóvar indicó que le realizó dos (2) advertencias al Apelante.[17] Explicó que la primera la efectuó al momento del arresto y la segunda al momento de ingresarlo a la celda.[18] Esbozó que, en todo momento, el señor Collado Rodríguez gritaba, pero de todas formas, firmó todos los documentos que las autoridades le entregaron.[19] En cuanto a Gladys e Ingrid, la agente Almodóvar atestó que en el

---

[9] Véase, Transcripción de la Prueba Oral ("TPO"), pág. 6, líneas 1-23.
[10] *Íd.*, pág. 6, líneas 23-26.
[11] *Íd.*, pág. 6, líneas 25-26.
[12] *Íd.*, pág. 6, líneas 26-28.
[13] *Íd.*, pág. 7, líneas 2-3.
[14] *Íd.*, pág. 7, líneas 4-7.
[15] *Íd.*, pág. 7, líneas 12-14; pág. 17, líneas 28-29.
[16] *Íd.*, pág. 7, líneas 12-14.
[17] *Íd.*, pág. 7, líneas 11-30- pág. 8 líneas 1-16.
[18] *Íd.*, pág. 7, líneas 11-30- pág. 8 líneas 1-2.
[19] *Íd.*, pág. 8, líneas 23-28.

momento en que las estaba entrevistando, **ambas estaban "llorando, nerviosa".**[20]

Durante el contrainterrogatorio, la agente Almodóvar afirmó que no presenció los hechos ya que estos ocurrieron antes de haber llegado a la escena.[21] Detalló que desde que llegó al lugar de los hechos, hasta que entrevistó a la primera persona, trascurrieron unos nueve (9) minutos.[22] Indicó que la primera persona a quien entrevistó fue a Ingrid.[23] Puntualizó que, a los dos (2) minutos, salió Gladys de su residencia, la cual queda justo al lado de la residencia de Ingrid.[24] De igual manera, la Agente Almodóvar especificó que en la entrevista que le realizó a las querellantes, éstas indicaron que el señor Collado Rodríguez expresó palabras soeces en la calle y luego en la casa de Ingrid.[25] De igual forma, la agente Almodóvar comunicó que, no obstante el señor Collado Rodríguez dormía en la misma residencia que Gladys se podía acceder a su habitación por una puerta que se encontraba al costado de la casa.[26] Narró que se personó al cuarto del Apelante y desde que lo encontró, éste estuvo todo el tiempo gritando incoherencias.[27] Referente las preguntas realizadas relacionadas a las advertencias que la agente Almodóvar le hizo al Apelante, ésta respondió que el señor Collado Rodríguez siempre se mantuvo gritando y que nunca precisó si entendió o no las advertencias que se le hicieron.[28]

Una vez culminó el testimonio de la agente Almodóvar, se sentó a declarar Gladys Rodriguez Ramos ("Gladys"). Esta testigo especificó que residía en barrio Ranchera ubicado en el municipio de Yauco, que **tenía setenta y ocho (78) años** y que su hijo era el

---

[20] *Íd.*, pág. 10, líneas 10-14
[21] *Íd.*, pág. 11, líneas 23-24.
[22] *Íd.*, pág. 12, líneas 2-4.
[23] *Íd.*, pág. 12, líneas 6-8.
[24] *Íd.*, pág. 13, líneas 3-8.
[25] *Íd.*, pág. 13, líneas 13-18.
[26] *Íd.*, pág. 14, líneas 16-26.
[27] *Íd.*, pág. 15, líneas 9-25.
[28] *Íd.*, pág. 16, líneas 13-23.

señor **Collado Rodriguez a quien identificó en sala**.[29] Narró que el 1 de enero de 2024, se encontraba cenando con un hermano y pidió que este último revisara un "carrito", el cual el señor Collado Rodriguez tenía interés de adquirir.[30] Narró que, en ese momento, el Apelante **se molestó**.[31] Relató que, acto seguido, se trasladó a la residencia de su hija Ingrid. En específico, expresó:

> Pues yo le dije, me voy para casa de la hija mía y me fui para allá para casa de la hija mía. Entonces, él fue a preguntar a la hija mía, que él le había dicho eso que ella le dijo que ella no sabía nada, entonces, pues, se enfureció **y dijo, "lo voy [sic] matar"** entonces yo le dije a la hija mía, "pues vamos a llamar a la policía", a ver qué porque la persona que usa sustancia es una enfermedad (énfasis nuestro).[32]

La señora Gladys manifestó que no supo a quien específicamente el Apelante se refería en cuanto a las expresiones previamente citadas, es decir, no supo si fue a ella o a su hija a quien iba dirigidas esas palabras.[33] Esbozó que el Apelante realizó esas manifestaciones fuera de su casa y posteriormente éste procedió a explotar una goma del carro de Ingrid.[34] Expuso que el Apelante iba de camino a la casa de Ingrid y ella también se dirigía hacia esa residencia.[35] Explicó que cuando ésta llegó a la residencia de su hija, el Apelante regresó a la casa donde éste residía.[36] Asimismo, aclaró que el Apelante nunca le dijo palabras soeces.[37]

Durante el contrainterrogatorio, la señora Gladys afirmó que en cuanto las palabras amenazantes del Apelante, no pudo establecer a quien iba dirigidas.[38] Agregó que su hijo, el Apelante, tenía problemas con sustancias controladas, lo cual entendía que era una enfermedad.[39] En el redirecto, **la señora Gladys aclaró que**

---

[29] *Íd.*, pág. 19, líneas 29-31- pág. 20 líneas 1-8.
[30] *Íd.*, pág. 20, líneas 12-20.
[31] *Íd.*, pág. 20, líneas 22-30.
[32] *Íd.*, pág. 21, líneas 3-8.
[33] *Íd.*, pág. 21, líneas 9-11.
[34] *Íd.*, pág. 21, líneas 15-16.
[35] *Íd.*, pág. 23, línea 4-11.
[36] *Íd.*, pág. 23, líneas 10-11.
[37] *Íd.*, pág. 23, línea 31.
[38] *Íd.*, pág. 24, líneas 27-31.
[39] *Íd.*, pág. 25, líneas 21-28.

**cuando el señor Collado Rodríguez hizo la expresión "las voy a matar", únicamente se encontraban presentes Ingrid y ella**.[40]

La próxima persona en declarar fue **Ingrid Collado Rodríguez ("Ingrid")**, hermanda del Apelante, quien indicó que residía en el barrio Rancheras en Yauco.[41] **Identificó en sala a su hermano, el señor Collado Rodríguez.**[42] Comenzó su relato de la siguiente forma:

> Nosotros nos encontramos, mi mamá, mis 2 niños y yo en casa de mi tío, como un ratito, como era, este... el día de año nuevo compartimos con mi tío, regresamos a nuestra casa, mi mamá reside al lado de la mía ella cogió para su casa, yo cogí con mis niños para mi casa, yo cerré la puerta y nos pusimos a ver televisión. Luego llegó el señor Santos a preguntarme que adónde yo estaba con mi mamá la cual le dije que yo no tenía por qué decirle y luego me pregunta que quien le había dicho a mi mamá de que el carro estaba dañado. Le dije que yo no sabía nada del carro, el señor Santos sale rápidamente de mi casa de, de al frente de mi casa se dirige hacia mi vehículo y me explota una goma.[43]

Tras este incidente, la señora Ingrid narró que se dirigió a casa de la señora Gladys y de ahí, procedió a llamar al cuartel de la policía de Yauco.[44] Expresó que fue su madre la que solicitó que llamara a la policía y, **además, notó a la señora Gladys nerviosa**.[45] Narró que "[l]uego mi mamá me indica que mi hermano había dicho que me **iba a hacer daño a nosotras**. Pero yo no, no lo escuché a él porque yo estaba en mi casa".[46] Reiteró que la amenaza en concreto era que el señor **Collado Rodríguez las iba a matar**.[47] Comentó que ella estuvo en su casa, pero salió cuando escuchó el ruido de la goma explotarse.[48] Alegó que, posteriormente, llegó la policía y fueron entrevistadas por la agente Almodóvar.[49]

---

[40] *Íd.*, pág. 28, líneas 13-20.
[41] *Íd.*, pág. 29, líneas 1-6.
[42] *Íd.*, pág. 29, líneas 7-10.
[43] *Íd.*, pág. 29, líneas 14-23.
[44] *Íd.*, pág. 29, líneas 29-31.
[45] *Íd.*, pág. 30, líneas 19-21.
[46] *Íd.*, pág. 31, líneas 1-3.
[47] *Íd.*, pág. 31, líneas 4-8.
[48] *Íd.*, pág. 31, líneas 16-17.
[49] *Íd.*, pág. 31, líneas 18-20.

Durante el contrainterrogatorio, la señora Ingrid reafirmó que no escuchó a su hermano expresar las palabras de las amenazas.[50] Tampoco pudo precisar si el evento de las amenazas fue antes o después de incidente con la goma.[51]

Con este testimonio, el Ministerio Público dio por sometido su caso. Con este recuento presente, procedemos a resolver. Nos corresponde evaluar si el foro primario incidió al encontrar culpable, más allá de duda razonable, al señor Collado Rodríguez por violentar el Artículo 127-B del Código Penal de Puerto Rico, *supra*. Aclaramos que el concepto *más allá de duda razonable* se refiere a aquella insatisfacción o intranquilidad en la conciencia del juzgador sobre la culpabilidad del acusado una vez desfilada la prueba. *Pueblo v. García Colon I, supra.*

En el presente caso, la prueba desfilada en el juicio demostró que la señora Gladys Rodríguez Ramos, tenía **setenta y ocho (78)** años el 1 de enero de 2024. También demostró que ese día, su hijo, el señor Collado Rodríguez, aquí Apelante, quien fue identificado en sala y quien además residía en la misma propiedad de su madre, se alteró tras tener una discusión relacionada a un vehículo de motor. Si bien aparenta haber ciertas discrepancias en los testimonios de las tres (3) testigos que declararon en el juicio, **todos coinciden en que el señor Collado Rodríguez usó la expresión "las voy a matar" la cual iba dirigida a su hermana Ingrid y a su madre Gladys.** Pese a que el testimonio de la señora Gladys no precisó a quien específicamente el Apelante se refería, **si admitió que al momento en que el señor Collado Rodríguez hizo la expresión, únicamente se encontraba presentes ella y su hija Ingrid.**

Nótese que, conforme a la prueba previamente reseñada, la cual le mereció entera credibilidad al foro primario, se puede

---

[50] *Íd.*, pág. 35-, líneas 1-9.
[51] *Íd.*, pág. 36, líneas 12-16.

concluir que el señor Collado Rodríguez realizó una manifestación expresa de voluntad, de manera verbal, de causarle daño a una persona determinada, quien en este caso fue a su señora madre, Gladys Rodríguez Ramos, quien al momento de los hechos tenía setenta y ocho años.[52] Por consiguiente, a tono con estos hechos probados, colegimos que quedaron configurados, **más allá de duda razonable,** los elementos del delito contenido en el Artículo 127-B del Código Penal, *supra.* El aludido Artículo establece que "[t]oda persona que amenazare a una persona de edad avanzada con causarle daño determinado a su persona, a otra persona o a los bienes apreciados por ésta será sancionada con pena de reclusión por un término fijo de seis (6) años".

Ciertamente, la prueba testifical vertida, comprobó todos y cada uno de los elementos contenidos en el precitado Artículo. Cónsono con lo anterior, no albergamos duda de que, conforme a dicha prueba, el Ministerio Público rebatió de forma clara la presunción de inocencia que le cobijaba al señor Collado Rodríguez. Por último, juzgamos además que, no encontramos indicio de pasión, prejuicio, parcialidad o error manifiesto que nos obligue a intervenir con la apreciación de la prueba oral del foro primario. Por tal motivo, es forzoso **concluir que el señor Collado Rodríguez amenazó de muerte a su madre**.

Por consiguiente, reiteramos que la prueba presentada por el Ministerio Público **probó más allá de duda razonable** el delito imputado al Apelante. **Por tanto, el error imputado no se cometió.**

**IV.**

Por los fundamentos expuestos, **confirmamos** la *Sentencia* Apelada.

---

[52] Si bien el Código Penal de Puerto Rico no define el concepto "persona de edad avanzada", la Ley 138-2014, la cual incorporó el Artículo 127-B, hace referencia a la definición del Artículo 2 (p) de la Ley Núm. 121 de 12 de julio de 1986. Dicho estatuto dispone lo siguiente: "[p]ersona de [e]dad [a]vanzada, es la persona de sesenta (60) años o más."

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones